Good morning, please be seated. We are here for the in-bank argument in Movessian v. Victoria Versicherung AG. Counsel ready? Yes, Your Honor. You may proceed. I'm Mr. Saltman. Mr. Saltman, yes. Very good. Thank you. Good morning, and may it please the Court. Over the past 11 years, on six separate occasions, three national administrations from both parties, from varying portions of the ideological spectrum, unambiguously declared that it is against the foreign policy interests of the United States to legislatively characterize as a genocide the century-old tragic events in the former Ottoman Empire. In Section 354.4, California took a contrary path, but it has never been a constitutionally available option for any State to individually have its own foreign policy. That's clear from the decisions in Deutsch, in Garamendi. It's clear from the decision in Zschernig. It's clear from a whole line of decisions going back to Pink and Belmont. Excuse me, counsel. Yes. Has anybody ever asked the State Department for a position on this? We have not, Your Honor. The State Department – the U.S. position was – has not been to take a position in any of these cases, at least in Bonsagher or this case. The Supreme Court issued a call for Solicitor General's views in the Bonsagher cert petition. The district court didn't ask for a statement of interest, in other words. The district court did not ask for a statement of interest from the State Department or the U.S. Should we? Well, certainly, you're free to. And if – if – if – Well, thank you. Well, I – I – I don't – Does – does Victoria Versicherung AG have a view on this? If the answer is no, that's – that's a perfectly fine answer, too. No, no. I think – I think the answer is that if the purpose of calling for the views of the United States is to figure out what the views of the United States are on this issue, I think we have an 11-year history that makes clear what the administration's various administrations view. What is it about lawyers that they're not able to give a yes or no answer to a yes or no question? Does your client believe we should call for the views of the United States? We are – we are – The next thing I want to hear from you is either the word yes, the word no, or the phrase no position. How about that? Yes is fine with us. That's absolutely correct. And we – we're – we believe that the position of the United States has been consistent for 11 years. Do not doubt whether that will change. Now, obviously, there's a question of relevance to some extent. In the Gernot case, the – the – the United States took a position opposed to preemption, and the Supreme Court found preemption anyway because it thought the United States position was not appropriate in a 7-to-1 decision. So I don't think it answers the question. But if the Court thinks there's an issue about what the position is – Okay. Let's talk about foreign policy a bit. Sure. This is not directed at the – your client is not a government entity, right? Correct. It's not in any way affiliated with the government. Correct. Okay. So in what sense is it conducting foreign policy to pass a law that governs the relationship among private parties? Well, I think that's – that was certainly true in Garamendi as well, that in Garamendi, the client wasn't – it was a trade association and an insurance company. And the issue is, and it's true virtually in all the cases, there wasn't – in Deutsch, there wasn't a foreign – there wasn't a government party. They were private parties. I think the question is whether the statute violates – the State statute violates the preemption obligation. And if it does, whether it's a government or not, the State has interfered in an area of foreign affairs or constitutional structure that it may not do so. And I don't think there are any of the cases involved the foreign government party in which the Court found foreign affairs preemption. I'm wondering what the – where we draw the line here. Could California have Armenian Genocide Day? Could the legislature pass something like that? Or could they – could it say you have to teach Armenian Genocide in high school? Well, the – Is this term just banned from the lexicon? No. I don't think this is a free speech issue. That is, the issue that comes up in legislation like this, as opposed to Memorial Days and things of that sort, first in the Memorial Day, Remembrance Day issue, nobody really has standing to challenge the legislation. Nobody can get up there and say I'm harmed by somebody saying something else. And that really takes care of all the State positions. This legislation is unique in creating rights, and it creates rights and a cause of action, just like was the situation in Deutsch. And those rights and those claims that will wind up litigating in a forum, claims that will be found offensive by Turkey or likely to be found offensive by Turkey, is what changes this statute from the Remembrance Day issues. And I think if you look at the same thing that came up in Jernig and von Sacher and Deutsch, in all of those situations, there were causes of action, not in Jernig, but in von Sacher and Deutsch. There are causes of action that are created which themselves create a problem. It's not rejecting speech. It is creating claims which give a forum for disputes that are sensitive foreign policy issues. And in Jernig, one of the things the Court was concerned about was that the probate court proceedings were being used by various parties to take positions against Eastern European or Eastern Bloc countries in a way that they didn't. Kennedy. The Supreme Court had a record. Justice Douglas elaborated what the courts had been doing before they invalidated  We simply have a claim against an insurance policy. Right. by the heirs, presumably in most cases, the heirs of beneficiaries. So what is it in the nature of this enforcement of an insurance policy that would be offensive? You think they're going to wind up relitigating the genocide? Or what is the nature of the claim? It's a breach of contract, isn't it? Well, it's a breach of contract claim. It relates to claims specifically with regard to genocide allegations. The whole definition of the statute revolves around that. The United States has taken the position numerous times that resolutions with no teeth other than saying that there are resolutions, that is the Federal equivalent of what Judge Silverman referred to, that those are against the foreign policy interests of the United States. If that is against the foreign policy interests of the United States as expressed by three administrations and three different presidents, then I don't think it's appropriate for anybody to say, no, it's not against the foreign policy interests of the United States because it's only a breach of contract lawsuit. In Garamendi, the issue was just producing documents, just producing millions of documents, and why is that a problem? Garamendi was a conflict case, correct? Conflict preemption? Garamendi went off on conflict. But let's just assume there is no conflict preemption here. What's your position on field preemption? I think it is absolutely clear by the resolve by field preemption. I think this runs afoul of the field preemption rule. I think if you look at Zschernig, this is much more, or certainly as substantial as the situation in Zschernig where there was no U.S. policy whatsoever, where the Solicitor General took the position that there was no problem whatsoever, and the Supreme Court said in the 7-to-1 vote, the absent vote was the former Solicitor General, happened to be Justice Marshall, that that was interfering with the field of foreign affairs. I think if you look at Deutsch. You know, you didn't – I mean, in answering this, I don't think I fully understood or perhaps you didn't give a full answer to Judge Fisser's question, is how does it implicate? Because the – in doing a litigation, you're not really litigating about the massacre. It doesn't matter how people died. I mean, this would apply, the claim would apply, whether somebody died in their bed at home of cancer, right, if the claims were opened up. So I think that's what I understood Judge Fisser to be asking, and I don't think you answered that. And until we get into that, I'm not sure how you can answer Judge McKeown's question. Well, I don't think that if you – I think you can. What is it about – I mean, let's say the claim goes forward. Other than the fact that it is being litigated under a statute called, that makes a reference to the Armenian genocide, what else is it about the litigation that in any way implicates the – the – I don't think it would be possible to litigate this – any of these cases without getting into issues of whether there was an Armenian genocide, how the – how the decedent died. Well, one thing we're going to have to prove is how the decedent – or when did the decedent die. Did he die within that particular – There will be some who died in bed of cancer, right? There will be some who died in bed of cancer, but there will need to be birth certificates and death certificates. Those would not – that lawsuit involving those claimants would not in any way implicate the genocide, right? I don't think that's correct. I think it is impossible to litigate a claim under an Armenian genocide claim during that period where documents have been destroyed for decades, where the country was essentially – So if Congress – Congress, if the State legislature passed the same law and called it the Mickey Mouse law, that would change things? It would be exactly the same statute, the same – it would cover the same period in history. It would cover the same group of people, but they wouldn't use that term. They would call it the Mickey Mouse law. I think if you insert the words Mickey Mouse in the 12 times in the statute that the words Armenian genocide victim are there, you would obviously change the meaning of the statute. But the fact is that that is the phrase that the United States has repeatedly found offensive and repeatedly found to be not in the foreign policy interests of the United States. Once the United States – Just so I understand your position, so if they remove the phrase, let's say the legislature is, you know, has some of the audience listening to the argument, and they go back and they say, listen, we can solve the problem here, move the case by amending the statute to change its name, and we'll remove that phrase from the statute, that would – that would solve your problem? No, it wouldn't solve the problem for two reasons. One, if you look at the statute and you remove that phrase and put Mickey Mouse or Donald Duck or whatever else – Well, let's say they'll put anything. They put the statute for the, you know, reviving of certain insurance claims. This statute then makes, as it's written, then makes no sense. If we're talking about another statute which isn't written, which might have different terms, it's hard to answer that. But this statute, if you excise those terms, makes no sense. The statute is all built around a defined term of an Armenian genocide victim. Could the legislature revive all claims from that time period, regardless of where they arose? Could the legislature say the heirs of everyone who died between date A and date B, we hereby revive that, with no reference to foreign policy, just across the board? Well, I think there are two different versions of that. One is, does that involve claims of everywhere, anybody in the world, anywhere in the world, because this statute involves claims that can be brought in California no matter where the question is. I understand that. That's why I asked you the question that I did. If it were not limited to persons in a specific country, but were just simply we think things were badly processed in those days and we want to give everybody a new chance, is that okay? I think there are serious due process issues that we had raised a lot. But not preemption issues. If it doesn't relate to foreign policy itself. So is it the – is it, as Vonceer at least makes manifest and as Garamendi suggests, is it the motivation then of the legislature, its purpose that matters? Well, certainly that's a significant issue. If you look at Garamendi, the opinion is ripe with references to what California's purpose was and what the Federal Government's purpose was. And if you look at the statement of – the statement that accompanies – that is part of the statute, that accompanies – it's the non-codified portion, it's absolutely clear the legislature's purpose was to affect foreign policy, to take a particular interest in a particular dispute. And when the question came from Judge Fisher about, well, there was a record in Zschernick, but there's no record here, there is a record here. The legislature gave it to us. That is, the statement of what its intent was, what it hoped to accomplish, is the record that shows that there was a foreign policy purpose. In Zschernick, you had a facially neutral statute. That is, it was just a dissent statute. It didn't mention anything about one country or another. It just said as long as there's reciprocal rights to inherit, that's fine. And in that situation, Justice Douglas went through, obviously, what had at that point been a long history, a 20-year history of these statutes, and said these are being used in a particular way, and while it's facially okay, it is not as applied okay. In this situation, we don't have to get to that point because facially, in the statute as passed, the legislature has indicated a very clear foreign policy purpose. That is the reason it's there. Kagan. Ginsburg. Yeah. Could you go back? I don't think you answered my question except to say, of course, it's field preemption. You have the footnote in Garamendi which alludes to a situation with foreign policy which could also implicate field preemption, but what's the analysis under the field preemption that distinguishes it, why it might not be conflict preemption, but could still be field preemption? Well, I think traditionally, the way the courts have approached it on the theory of taking narrower reviews is that they've looked at the conflict preemption issue first rather than field preemption. And I think what Garamendi says is, well, we're going to do that here, and in fact, I think that's what was done in Deutsch. Deutsch is a long discussion that says, as I read at least, I think the opinion is saying this is available for field preemption, but we're not going to decide it on that basis because we have a conflict preemption basis. So that's a jurisprudential issue that, obviously, courts are free to do if they want to take the narrower view rather than the broader view. I think if you look at the conflict issue, there's clearly a conflict, and I think it would clearly be appropriate for conflict preemption. I think Garamendi also says, and von Sacher, I think, says, that you have to balance the State interests here. When the State interests here appear to be very limited, field preemption might well be the issue. In Garamendi, the Court goes off on conflict preemption, but lays out the possibility of field. In von Sacher, the panel finds that there's no current policy, and because there's no current U.S. policy, it says there's no conflict, and then it has to go to field preemption. So if the Court finds there's a conflict here, I think the case is made clear that this would be preempted under conflict preemption. And I think the normal jurisprudential rule would be to deal with the narrow issue, not that, of course, the Court has to. The Court can make rules that are broader. If you didn't find field preemption, conflict preemption, then I think you have to get into the field preemption analysis. And the answer is, you know, what is the right of the State to have any foreign policy, whether we like it or not? The availability from the time of the Federalist Papers, everybody has understood that it's a mistake for States to engage in foreign policy. It caused the Articles of Confederation to fail. It was one of the main issues talked about in Federalist 20 and Federalist 88. And the issue is, what interest does the State have to insert itself when the Federal government says, listen. You can look at it, you can look at it just as though the State were, its interest is in regulating insurance. Statutes of limitation. And that's a classic State function. I think there are two answers to that, Judge Pius. One, these defendants are not admitted insurers in the State, period. So it's not regulating these defendants. More importantly, in a broader sense, if you look at Garamendi, which involves the licensing of insurers, a classic State function, whether they can be admitted in the State, the penalty in Garamendi was you can't do business in the State if you don't comply with the statute requiring the production of millions of Holocaust documents, and the Court says not good enough, the Supreme Court says that's not good enough. Now, I don't think there's any way to rationally distinguish what happens in Garamendi on a State licensing issue from this, what the Court really says in all these cases. I'm just curious, just to follow up on that part of your answer to Judge Pius, if your clients are not licensed in the State, how are the minimum contacts, what are the contacts with the State so that – I just want to fully understand your answer to Judge Pius's question. There are three defendants in the case. I represent Munich Reinsurance, which is the ultimate parent. Munich Reinsurance does some business in the State. It's not admitted insurer. It's a reinsurer, for one thing, and it doesn't, therefore, sell insurance policies. I know absolutely nothing about insurance law, so I take it if you're not selling to the public, if you're a reinsurer, you don't need to be licensed. You don't need to be. You can be licensed, but you don't need to be because you're not selling insurance to the general public. Okay. The other two defendants are German defendants. One is called Ergo. Ergo is a holding company which is owned ultimately by Munich Re and Ergo's subsidiary, which is called Victoria, which is actually the company that issued life insurance policies here. I don't represent either of them. A motion was made and withdrawn when we got the 1292b by their counsel on minimum contact grounds. What about the never-been-sold? It's an issue not before us, but it would be before the district court at the appropriate time. I wasn't suggesting it was an issue. I just, since you said they were not licensed, I just wanted to know what the context was so we could sort of understand your answer to Judge Pius' question about regulating. Go ahead. No, you had talked about whether this case was distinguishable from Garamendi, and I wonder whether, in your view, it's distinguishable from Bonserre, and if so, on what ground? I don't think it's distinguishable from Bonserre if you get past the conflict question. That is, I think we have a conflict argument here which is substantial and it's current, and therefore, you could distinguish it in the sense that Bonserre didn't have a conflict preemption issue, so they or that was the findings, so they went on to the field preemption issue. But once you get to the field preemption issue, the question is, if you look at the here, that is, we're talking about an ongoing war with an ongoing NATO ally who supplies or permits us to supply troops during that war with a current President and two immediately prior Presidents saying, this is not in our foreign policy interest. You have a current issue in a volatile area of the world that the administrations that three administrations have said, and a whole slew of former Secretaries of State from Secretary Christopher and Albright on one side to Secretary Schultz and Kissinger on the other side, all have said this is not in the foreign policy interest of the United States. Under that circumstance, when you compare it to Bonserre and Kissinger, it's not in the foreign policy interest of the United States. When you say this, what are you talking about? You're not talking about this statute. I'm not talking about this statute, but referring to an Armenian genocide in a House resolution with no teeth whatsoever, just making the statement. So this statute goes much farther than that. The House resolutions which have come up over the years. It's a little different because that's the Congress of the United States speaking. It may be speaking with a soft voice, but nevertheless, it is the economy of the United States. This is merely California, so an underling entity that, you know, is some – you know, has much less standing in the world community, I would assume, than does the U.S. Congress. It's sort of like saying Burgundy, you know, it's one of the – or, you know, British Columbia, let's say. Who cares what British Columbia says in terms of foreign policy? If the Canadian parliament says something, that, of course, is a much different matter. The answer is, one, look at Turkey's brief. Turkey does. Number two. Kennedy. Turkey does. The country of Turkey does. That's why their amicus brief is in the number. Kennedy. Well, what if it's Berkeley rather than California? What if it's the municipality of Berkeley or – I don't think it makes any difference. That is, because you're smaller, you don't get a stand in foreign policy affairs. The town of whatever, of Bohonk, New Hampshire, doesn't get a position on foreign policy affairs because it's smaller. Massachusetts doesn't get it in the Crosby case. It's a little weird to have, you know, some foreign country many thousands of miles away deciding what a municipality in California can and cannot pass its way of its laws because it gets its nose out of a joint. I mean, so it's a little weird, isn't it? No. I think it actually proves the point. If the sensitivity of the foreign nation, who's our ally, is sufficiently heightened that the president and the series of secretaries of state and secretaries of defense say this is a bad idea, because let's remember, what happened when Turkey got – They say it's a bad idea when the U.S. Congress, when the United States, when the government of the United States or a major legislative body of the United States says this, it's one thing. But, you know, if Alpine County decides to pass a resolution, you know, it's – Well, in this case, we have 15 percent of the U.S. population and probably the one – And the best 15 percent of that. I should hope so. But except for those people in the panel who aren't from California. Exactly. But I think if you look at the issue, and the answer is, I think, fairly clear, that the States don't have a position to assert. And the answer, just as it is in Garamendi, is like, well, why do you care in Garamendi? It's just California saying you have to do this, and the only thing that will happen in Garamendi is some insurers won't be able to do business in California. Big deal. And the Supreme Court's answer is, yes, it's a very big deal. It's California. Think about it in Oregon terms. It's just Oregon probate law, right? It's just whether Descendant A gets to get property from Grandpa. And the Supreme Court says, no, it's not. It's that an individual judge in Multnomah County, Oregon – I hope I pronounced that right. Close. Close, but not close. Multnomah. There's an individual judge in that particular county says, I don't like how Poland back during those days, or Romania, or any of the other communist bloc countries in those days, is handling our reciprocal suit. So who cares? It's just a judge. He's going to judge a judge. I'm sorry? We were right, too. That's right. So I think the fact that it is a State, I think, proves our point. The other issue is there are 50 States, we all might have noticed, and if 50 States took varying positions or took the same position, the answer is that for purposes and Japan lines, the Japan lines case tells us that. The Japan lines for these purposes says there's only one United States. We speak with one voice, and if it happens to be that voice is coming from the left side of the map rather than the right side of the map, so be it. You've talked about voices. You've got your voices about five minutes left. I would like to reserve the rest of my time. Thank you, Your Honor. I notice there are two counsel listed for the other side. Are you splitting your time? Yes, Your Honor. OK, keep your eye on the clock, and whatever you have left over when you sit down, your co-counsel will get. Yes, Your Honor. Lee Boyd, appearing on behalf of appellees Arzumanian, Ayolton, Kagerian, and Kagerian. And we'll take 15 minutes of my time split with counsel for appellee Movsesian. May it please the Court. In this case, we asked the Court to affirm the equilibrium, constitutional equilibrium between Federal and State power, where absent a clear statement of foreign policy and a congressional mandate in conflict, the state statute here, 354.4, must stand, particularly where California has acted within its state responsibility, its traditional competency in providing and extending statute of limitations for garden variety insurance claims, even denoting the beneficiaries of those claims using the term Armenian genocide. Members of the Court, this is not a case. Counsel, what's the purpose of this legislation if not to express disapproval of the events that are called the Armenian genocide, and to give special privileges to those who are viewed as the victims of that event? Well, two parts to the answer, Judge Graber. One is that the beneficiaries of the statute extend beyond, as Chief Judge Kaczynski mentioned, genocide victims. They could be lived during a period of time in a place, in the former Ottoman Empire, and have died in their sleep, or for some other causes, not the massacres. That's one of the issues. We would be deluding ourselves if we thought that was the purpose of the statute, though, wouldn't we? Well, Judge McKeon, the purpose of the statute is to extend garden variety insurance claims for tort and contract. But for whom and why? That's my question. What is the motivation of the State legislature here? To provide a cause of – to extend a cause of action, the statute of limitations, for a group of people who have special needs in determining their rights under tort and contract, much like the Mexican immigrant workers of the Bracero program in the Northern District of California case. That's much like the beneficiaries intended in the Garamendi case. I mean, I guess I don't see the distinction in the legislature's motivation between this kind of statute and the statute in Garamendi or the statute in Vonserre. The purpose seems to be to make a statement and help out a group of people because of disapproval of something that happened in another country. But in the Garamendi and Vonserre case, Judge, the purpose of the statute was to provide judicial remedies that had been settled by the United States government in their conduct of foreign affairs. They had been settled pursuant to treaty and or executive – treaty in Deutsch and in Vonserre by post-war claim settlement, which is the distinction here. And I point out the Medellin v. Texas case, which is the most recent foreign affairs preemption case, that distinguishes where we have an exercise of executive power pursuant to that longstanding and pervasive post-war claim settlement. And States may not interfere with that. Here we do not have a post-war claim settlement, nor do we have a provision of judicial remedies that had been provided by the executive branch under that longstanding and pervasive congressional consent. We don't have either one of those present here, and that's what the preemption doctrine turns on. But that's a conflict preemption. But if you didn't have that in Vonserre, they're talking about the statute, and they say by enacting that statute, California seeks to redress wrongs committed in the course of the Second World War. That motive is fatal, and then they cite the statute. If you just substitute there, by enacting this statute, it seeks to redress wrongs that had been committed during the Armenian Genocide. How can you distinguish this statute from Vonserre on the field preemption issue? In the issue of field preemption, the question is, even absent a conflict with Federal policy, has the State of California overreached, reached out into the area of foreign affairs that is beyond their traditional purview? The purpose of this statute is not to – doesn't require any adjudication or determination of the victims of genocide. It requires only proving the elements of contract or tort defense against a private – a private entity. It has nothing to do in its application by the courts. Kennedy, do these policies have war exclusions or anything like that, acts of war? If a life insurance policy says we cover everything except an act of war? That is a great question. In this particular record, we haven't gotten into the actual insurance policies on whether they provide. But it could. They could. It could. So in that case, wouldn't the question be presented factually, that they would have to go back into the cause of death and whether the Armenian atrocities were, in fact, part of an act of war or not, and so on and so forth? Yes, Judge Fischer. And that brings us back to the field preemption. Has California overstepped its boundaries? As Chief Judge Kaczynski mentioned, this statute is a statute dealing with the insurance industry, against private industry. Well, why would it then have a description of the Armenian genocide if it's dealing solely with insurance? Without that description, there would be – we would not be here. I believe the concern of this court – That's the point. The concern of this court is the term Armenian genocide. So then we turn to the question. If it's not claim settlement, is there a conflict with a stated Federal policy, one that's clear and that doesn't change administration to administration, because that's not the preemption. If it – if there's no conflict, and I submit here Congress has not stood behind or mandated or authorized the asserted policy, so we cannot have conflict. The question, then, is in using that word, has California attempted to deal an iron fist with Armenian genocide, where the government prefers – What does iron fist have to do with field preemption? Either States can make statements about foreign policy or they can't, whether it's a velvet glove or an iron fist. Well, I mean, you make a very strong argument about conflict preemption, but I'm having difficulty squaring your view with Chernig and other cases that really are more like field preemption cases. And with the footnote in Garamendi, that discusses that. Yes, Your Honor. And in Chernig, Justice Douglas looked at the effect in the courts where State judges were adjudicating political systems which is not within the traditional competency of the State. Here, the purpose of this statute, as we said, is insurance. But even in delineating the name Armenian genocide, the State of California, if there's no more than an incidental effect on foreign affairs, has not stepped beyond its purview. And that's a key word here. And we have submitted – and I do want to address quickly the submission under 28J of the federal statute. And it's not what this case turns on, but it helps answer field preemption on whether or not the State of California has overstepped and overreached its powers here in merely using the word Armenian genocide. May I ask you, what's your position on asking the government to weigh in on this? Federal government? Yes. But also, Judge Silberman, the government has never been shy about entering these cases in statements of interest or amicus briefs. And all three of the cases relied on Garamendi, von Sacher, and Deutsch. The government was present. And there is no clear foreign policy here. And they could be here to clarify, and they've chosen not to. They do know where to find the court, and they are not shy. So I think it's very telling that not only do we not have a clear and consistent policy that doesn't change administration to administration, but they're not here to clarify it. And that goes to conflict. But again, I think the concern may be, if I may presume, whether California has overstepped in delineating, using this term, Armenian genocide, when it could have used female or beneficial. Well, can I just come back then to what I was trying to inquire about? You say it's not in the record yet because we don't apparently have policies. But if, in fact, policies emerge that do require litigating what the cause of death was and whether it fits within an exclusion or not, that gets to be sort of like what Justice Douglas was recounting in the Oregon case, which is in the application, you get trials basically about the events and the characterization, particularly when the statute here denotes the beneficiaries as genocide victims. Yes, Your Honor. And so there's almost a prejudgment in the statute that if you're a genocide victim, you have some right under California law to recover. Yes, Your Honor. If, in fact, in the first case, if we let this go forward and the first case presented such an issue, would that then turn the case all around and the insurance companies would be able to appeal and come back up and say, see, we told you so, now we're litigating, and now we've really got Turkey at odds. They've canceled our air bases and everything else. And this is the point I wanted to turn to. California, unlike Zschernig, where there was adjudication of political systems far outside what state courts do or state judges do, here Armenian genocide or the term genocide is also not only does it have what we would say It's a crime recognized not only by our Federal courts, as recently in the majority opinion in the Saray v. Rio Tinto case, this Court acknowledged. Genocide is one of those few crimes that not only civilly recognized in our courts concurrently with state courts of general jurisdiction, but also at the same time that these asserted foreign policy statements were being made, Congress passed an amendment to the Federal Genocide Act in 07. In that amendment, they extended states' power to legislate genocide, to adjudicate genocide in the criminal context, which is not this case. Would you see any difference if the statute said any victim, heir or beneficiary of a victim of genocide can basically find a forum here and an extension of the statute of limitation? Would that statute be distinguishable from the one we have here? No, Your Honor, because when Congress did speak, and Justice Scalia has reminded us not to look at the tea leaves of inaction, but to look at what Congress does say when they legislate, when they spoke in passing the Federal Genocide Statute, they did not carve out allies, U.S. allies or NATO allies. They did not carve out. They balanced their ---- But don't you think that there's a difference between the label genocide generally, which presumably you might have to prove you were a victim of genocide of some sort, and something that actually calls out what was a political and foreign affairs subject that is well known, and by calling out the Armenian Genocide? I mean, people know what it is. They may disagree, depending on where you live, as to whether it existed or not. There have obviously been all those debates. But isn't that different than if they just said, we just want to make sure any genocide victim that lives in our State, because these are difficult situations, would be able to have this extension? Because the legislative history shows us that the Armenian Genocide was spoken about on the legislative ---- on the congressional floor and acknowledged, they did not carve out any particular genocide. It's well within the power, and we're talking about power here, of the States to adjudicate, legislate the crime of genocide in any country. In other words, the answer to your question would be, it would make a difference only if Congress had spoken that there are certain genocides overseas. And that's not what the statute says. There are certain countries in which this is not acceptable to Congress. It is much like the Foreign Sovereign Immunities Act. There was a balancing by Congress. This is clearly going to upset some sovereigns to be sued in United States courts. But that's an incidental effect. What's more important is the prosecution of genocide as a use code against crimes. What's more important is that the States have that power concurrently with Federal courts. And if they, theoretically, can adjudicate the Armenian Genocide without any restriction by Congress, if they can, in theory, adjudicate it, an aider and abetter of Armenian Genocide, because in the Bush Administration that was extended during Congress's 2007 term, extended to include aliens being prosecuted for genocides overseas. If they have theoretical power, then certainly the legislature in this matter, where it's only a delineation of a term, a definition, where the Armenian Genocide, absent some provision in the individual contract, does not have to be litigated. But my point is the States have the power, and that's field reaction. Kennedy, can I get you back to Judge Fisher's question? Because I did not understand your answer. You just got bollocked up in the term genocide. And Judge Fisher asked what I thought was a pretty straightforward question, which I think is quite significant. What he said is, we don't have the terms of policies now, right? Let's say we were to rule in your favor at this point. You went back, policies introduced, and it turns out some of the policies, in fact, implicated death by genocide because they perhaps had a war exclusion. I'm characterizing, but I think that's what Judge Fisher was getting at. At that point, do we have to reconsider the validity of the statute? And I did not follow your answer at all. So we're now positing we come out in your favor, you go back, and then we have to When we actually do look at the policies, it turns out you do have to litigate things involving the genocide. Does that then flip the validity? Does that require us to reconsider the issue of the actual policies? No, Your Honor, because genocide is substantively different than war. War-related claims are categorically different. And I started my argument by saying this is not war-related claims. Genocide is a crime, is a term of art. It has a different status. And it is not part of that Garamendi line of cases wherein there are war-related claims that address wartime rights. Let me walk you through it just so I can wrap my head around it. So policies put in, the policy has a war exclusion, right? And at that point, the defendant says there's an exclusion for war, and plaintiffs say, oh, but this wasn't war, this was genocide. This was not two countries fighting each other and somebody gets in the way, civilians get in the way. What really was going on there, the Ottoman Empire was committing genocide against its population of Armenians. Why doesn't that dispute as to how you characterize whether this was war or genocide, why doesn't that then directly implicate the very issues of genocide and the issues of foreign policy that we're talking about here? It implicates the issues of genocide, but it does not implicate foreign policy because there is no stated or expressed clear statement of foreign policy that prevents any use of the term Armenian genocide, nor is there any treaty on point as there was in Deutsch whereby the Federal Government has overseen the remedies for these particular claims. But doesn't it bring you face-to-face with Churning again, where there wasn't a particular foreign policy involved, it was the adjudication of what was happening in another country that was viewed as sensitive. And in this hypothetical that's been presented, the question arises how to characterize what happened in this place and time in another country. But the preemption doctrine only looks to where the, one, if there's a conflict between what the Federal Government has stated with congressional mandate and authorization. Or implied field preemption. Or the question of whether the State here has overstepped into an area of foreign policy that has more than an incidental effect. Categorically, there is a difference between adjudicating political systems of Eastern Bloc countries, which is never within the jurisdiction of any State court, and they had overstepped in the application of that statute. Mr. Boyd, can I just ask you real quickly, suppose we invite the government to give us its view. And I'll just be a second. And suppose they come back and say this is going to cause a problem for the United States, it will embarrass our ally and whatever they say. Is that, is your goose cooked then? Is that the end of it? It wasn't in Medellin where the amicus brief by the State Department as Solicitor General was clearly claiming and asserting a foreign policy interest in that case. And the majority of the Supreme Court held that it was not preemptive policy. The question here is whether it is of the character and nature of preemptive policy. Does it have the Youngstown authorization and consent behind it? And here it does not. At best, what Congress did was not acquiescence. It was agreeing to not expose a conflict between the branches, because in the past Congress had adjudicated and recognized Armenian genocide. So there is no clear policy that is backed with congressional mandate, and that's the preemption doctrine. The second question, is California just getting out of its realm? And I've argued, and I will end on this because I know my time is down, that California is well- It's actually over. Yes, Your Honor. In answer to the questions, California is well in this statute, which is a generic garden variety insurance statute in both that context and even in drawing on the term definitionally of Armenian genocide. It is categorically different than what the courts were doing in the Zhernig case, which was something they have no power to do. And here, I've argued, they do have power to adjudicate, legislate in the criminal and civil sense the question of genocide. You're using that for co-counsel. Yes. Why don't you let your co-counsel- He's getting very anxious. Thank you. You can tell. Good morning. Yes. I'll just go straight and answer- You better introduce yourself. Mark Geragos, appearing for Father Mosesian, who's the lead plaintiff on this. Good morning. Could you raise the microphone? We can't hear you. I will answer Judge Fischer's question right away. The difference is that in the, and I can't pronounce it, the Zhernig case, was that was somebody, those were judges who were determining in real time what was going on in totalitarian regimes. If your hypothetical pans out, and I don't believe that it would because I don't think that there are war exclusions, but I don't want to bet on it, there's 271 policies that we're talking about. But all that would be done is what you do in most lawsuits, which is a historical analysis of a regime, by the way, that does not exist. And that's one of the things that the district court talked about in distinguishing this statute from all the other statutes. Judge Snyder, in her order, said this is not the situation where we have a Japanese labor where I'm going to be getting into things that are going to denigrate another autonomous country. But here's the thing, Mr. Geragos, here's my problem. We do have clear evidence that there is a sensitivity to labeling what happened at this time a genocide. As I understand your co-counsel, she would argue that if there is a war exclusion claim, genocide would not fall within that because it doesn't constitute a legitimate act of war. So if that's true and the insurance company is defending that it is a war exclusion, and then the plaintiff would be saying, well, it doesn't apply because what happened was a genocide, a true finding of genocide, that would be placing squarely as a matter of a California court declaring a finding that historically what happened was genocide. Now, she has argued, as I understand it, in this 20HA letter, that the government in the amendments to the torture statute or whatever has authorized states to do that. But am I understanding the argument correctly? I think that is her argument. I would submit to you that you never have to get to that point. I don't think you have to get to the point of making that determination, war exclusion or not. It is a — first of all, the statute reads, Armenian genocide or any other ancestry gives a defined period. It's a definitional term. But you have — in order to get within the statute of limitations, though, you're going to have to show that your plaintiff was an Armenian genocide victim. That's the definition. If you're looking at the statute of limitations. No, that's in order to fall within the terms of the statute of this expanded statute of limitations. To 1915 to 2013. Right. But you have to show any Armenian genocide victim. Or any other — of any ancestry who was — No, but the point is you're going to have to bring it within — you're going to have to show that the policyholder was, or, you know, the defendant. Right. You're back to Armenian genocide victim. Right. So for purposes of the statute of limitations, won't you have to necessarily litigate that? If they say, oh, there's no — there's, you know, she doesn't fall within the statute. I don't think you do, and I think it points out precisely why we're here. It's precisely because of the word genocide. If you had — it's a definitional term. If you said Armenian massacre victim, there wouldn't be, in fact, all of the supposed pronouncements by the executive. And mind you, the — you've got President Obama last year on April 24th using the Armenian term, Medz Yergin, which is the translation of the Armenian — I don't understand why the terminology makes any difference. If the issue is the motivation of the legislature to benefit a particular class of persons because of disapproval of a foreign government's activity, why isn't that enough? Even if they called this, as somebody said earlier, the Mickey Mouse statute, it seems to me that it's not the terminology that's the problem. Why isn't the legislature's motivation the problem? I don't think that the — because I would say you don't characterize it as their disapproval of something that happened. It is — and what the district court found and what the panel found is that you take subsection C. Subsection C is nothing more than extending the statute of limitations. Yes, there is subsection B there, but we're not there. And that was the reason that it's — But it extends it only for certain people. Right. And why is that? Well, it's no different than if you — why did they extend the statute for Northridge earthquake victims? There is always a discrete class of people that — And the reason was that they wanted to help people because of a natural disaster, and here they want to help people because of what is viewed as an unnatural political disaster. Except there's nothing in there that denigrates. And once again, I would anchor it to that and the difference between the Japanese labor cases. There's nothing in here that denigrates in the extension of the statute of limitations in subsection C, and it's severable, that says that somebody's got to make a determination as to what happened to an entity or a governmental entity that no longer exists. But here it says the statute — you know, we keep focusing on people who died during that period. It also extends to people who were deported or escaped to avoid persecution. I mean, that puts you right square in a political-type question, doesn't it? It does not put you in a political question. All you have to do, and all the legislature has done, is extended the statute of limitations to adopt what one of the previous questions was, what is your order of proof? Your order of proof, or how does this play out? It plays out by you have an insurance policy. If you're an heir or a beneficiary of the insurance policy, you go and you just prove your case that this person died during the bracket of periods. If you're a person that, during that period, they lived there, but then they escaped, for example, if I didn't fall in the died category, I escaped to avoid persecution, from whom? Well, that happens all the time. We do that on a almost daily basis with political asylum cases. Exactly. Political asylum cases. Political asylum cases where somebody — This is an insurance case, not a political asylum case. Right. But you're not — See, that's why it seems to merge, because you keep — you have to circle back on the conflict, don't you? I don't think you do. I think that's where the misnomer is. I think when you boil this down, and it was articulated, I thought, quite nicely, by the amicus that was filed by the attorneys general, that the issue here is some coming in and saying you can't use the word Armenian genocide. And the answer to your question is to are we interested in getting a certificate of interest to the State Department. They've had 43 opportunities from the other 43 States that have commemorated. Nobody's ever weighed in. Well, commemorated doesn't hurt anybody's pocketbook. This one potentially does, which is different. Right. But this doesn't hurt — this isn't directed at any point at a foreign government. This is a statute of limitations extension that does nothing more than allow, and we haven't reached any issue, and the district court didn't reach any issue, of due process. It just allows a statute of limitations between an heir who is here, and there are many thousands of them here in California, who wants to make a claim against an insurance company. This is — there is no Ottoman Empire whose sensibilities we're going to offend at this point. Suppose the person says, I get here because my great-grandfather escaped to avoid persecution from the Ottoman Empire, and the defense is, no, you escaped to avoid the draft, or you left because you just wanted a better life in America, and then you'd have to litigate whether there was persecution and whether that person was a victim of it, which is a political question, is it not? It's a historical — like any lawsuit, it's a historical determination of what the facts were. Just as if you had a car accident, you have to determine whether somebody ran the red light or they went through on a yellow or anything else. There isn't. It's not like Zernig, where you're talking about, look, here is a modern-day country, or a Cold War, as they talked about, and we have to worry about what the executive is doing with this modern day. This is a historical event, and you don't have to denigrate or make any decision. All you have to do is determine what the motivation was, I suppose. I don't think it comes to a political question. Did somebody leave that area and go to Syria? Thank you, Your Honor. Thank you. Just to quickly answer Judge Fischer's question and Judge Graber's question, if you look at ER-099, there are three parts. Part of it is the Second Amendment binding, the current complaint, and it refers to the plaintiffs, and it refers to Grandfather Tousonian, who was murdered during the genocide, and the next paragraph says Grandmother Tiresian, who was murdered during the genocide. And the next paragraph says Beneficiary of Karabachian, who was murdered during the genocide. There is no way to decide this case and these issues in which whether there was a murder and whether there was a genocide doesn't come to the forefront. Does it matter whether there was a murder as opposed to an accident? Well, it matters whether there was a genocide. It matters whether there was a genocide for foreign affairs preemption, I think, is the critical issue. I thought the phrases were being used simply as a shorthand way of designating the period in question, since the statute defines a period to genocide, and say, well, you know, this is something that falls within the temporal scope of the statute. I think if one looks at the historical and statutory note that is part of the statute, that's part of the chapter, there's no two ways about it. I mean, this refers to legislature recognizing a particular political circumstance involving a person. Let's say, you know, remember about the tsunami and earthquake in Japan? Yes. And let's say California was concerned about U.S. citizens that had claims involving Japan, and say, you know, this was a very hard time, people couldn't get to post offices, they couldn't communicate. So we're going to extend all policies for anybody who was in Japan at the time by six months, take account of the natural disaster, the disruption in communication, and so on, and then refer to it as, you know, as the tsunami. You know, whatever. Is that something that implicates foreign policy? I mean, the... I don't believe just because it's foreign that it implicates foreign policy. I mean, why isn't this just taking account? Look, some people had a rough time for reasons, making claims, you know, reasons of war, reasons of genocide, reasons of natural disaster, whatever. And we're in California. I want to make sure that those people get full benefits under all such contexts that they have available. I don't see that there's a foreign policy issue there just because it involves foreign claims. There may be due process issues, there may be foreign nonconveniences, maybe a whole variety of other issues. But just because there's a foreign nation involved doesn't mean it's necessarily foreign policy. Here, of course, we have Presidents and Secretaries of State and we have the Turkish Prime Minister and the Turkish President all saying this is a bad idea. That's not the situation in the Japanese hypothetical, I think. I mean, there's sort of a First Amendment to talk about things in this country even if other countries get the nose, you know, get unhappy about it. You know, we can refer to things, you know, we can refer to sort of the Stalinist era and say Stalin was a bad guy or worse. You know, even if Russia today were to still hold a candle to him, right? I think you've just posited the Jordan case. Excuse me? That's exactly the Jordan case. We were saying bad things about Eastern European bloc countries. While there were still ongoing communist countries, right? I do not – well, I think if you look at the administration's varying views, they don't draw the line between the Ottoman Empire and modern-day Turkey. Neither do the plaintiffs. They claim that Turkey is the continuation of the Ottoman Empire. That is a question of sensitivity within Turkey. Now, we don't have to agree or disagree. The fact is that the record before the court makes very clear that this is an issue of both United States sensitivity as to how the Turkish government will respond or the Turkish people will respond and Turkish sensitivity. If the two participants in the foreign affairs issue are both concerned about it, there is one answer, not whether they're right or wrong. The state has to stay out. That is the answer under the constitutional structure. It's not whether anybody's correct or incorrect. It is that it is a matter of foreign policy. So your answer is if Japan, for whatever reason, were sensitive about the tsunami, then your answer to my question would be the state would have to stay out. I don't think it would be sensitive about the tsunami. It might be. I think being the victim of a tsunami is much different than being accused of being involved in a genocide. Those are not at all related issues. I just want to – I think you're out of time. Yeah, correct. There was no U.S. brief in Van Zaaren until the Supreme Court called for the views of the Solicitor General. Very well. Thank you. Thank you. Excuse us, Mr. Roger.
judges: Kozinski, Schroeder, Reinhardt, Thomas, Silverman, Graber, McKeown, Fisher, Paez, Rawlinson, Ikuta